FILED
IN CLERK'S OFFICE
US DISTRICT COURT

★ MAR 22 2013

BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------------  X

RONALD PRESCOTT,

                    Petitioner,

    -against-

WILLIAM LEE,

                    Respondent.

-------------------------------------------------------------------  X

11-CV-482 (ARR)

NOT FOR ELECTRONIC
OR PRINT PUBLICATION

OPINION AND ORDER

ROSS, United States District Judge:

        Ronald Prescott ("Prescott" or "petitioner"), a pro se prisoner currently incarcerated at Greenhaven Correctional Facility, petitions this court for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Prescott challenges his May 17, 2006 conviction for Murder in the Second Degree and Criminal Possession of a Weapon in the Second Degree and his sentence of twenty-five years to life. He argues that his trial counsel made numerous errors and was ineffective. At trial, Prescott's attorney presented an alibi defense based on the testimony of Prescott's aunt, Linda Prescott. Ms. Prescott testified that petitioner had been with her the night of the murder. The prosecution, however, impeached this witness. As a result, petitioner contends, trial counsel invested everything in a losing strategy and ignored other viable defenses. Counsel also allegedly erred in failing to object to hearsay testimony, the prosecutor's opening argument, and an erroneous instruction on reasonable doubt; and in failing to request an instruction on the lesser included offense of Manslaughter in the Second Degree. Finally, Prescott argues his counsel did not inform him of his right to testify. For the reasons discussed below, the petition is denied.

1

## BACKGROUND

The facts relevant to petitioner's claims are as follows:

I.   *Trial*

Petitioner was tried in the Supreme Court, Kings County, in 2006. He was represented by
Joel S. Medows. See Rodriguez Hr'g Tr. 2. Larry Fredella represented the People. Id.
Following a hearing in which the trial court approved in-court identifications of petitioner, id. at
30, jury selection, Voir Dire Tr. 1-264, and a Sandoval hearing, id. at 188-202, the parties
commenced with opening statements. The prosecutor argued in his opening that the case was
"one of the oldest in time," in which "disrespect or maybe jealousy over a woman causes
murder." Trial Tr. [hereinafter "Tr."] 24. Prescott, whose street name was Banger, had been in a
long relationship with Ella Peck, and the couple had two children together. Id. at 25. On January
24, 2005, about a week before the crime, Peck broke off her relationship with Prescott and began
seeing another man, Philip Jamal Mason, also known as Ja. Id. at 25-26. A little before
midnight on January 31, 2005, the prosecutor argued, Prescott went to the Gowanus Houses in
Brooklyn and shot Mason with a .38 caliber revolver. Id. at 26. The People acknowledged that
Mason was a drug dealer and that on his body the police found a loaded 9-millimeter handgun,
thirty-one glassines of heroine, and three bags of marijuana. Id. at 29-30. The prosecutor also
mentioned several other people besides Prescott and Mason who were in the vicinity that night:
Roxell Rodriguez, Dwayne Herbert, Monica Ramsey, and Andre Prescott, petitioner's brother.
Id. at 27-28. With the exception of Herbert, none of these witnesses testified. The People also
argued:

2

> There was another person involved in this, defendant's cousin David
> Ortiz. David Ortiz had conversations with the defendant prior to the homicide
> where they discussed this whole situation. . . .
> Mr. Ortiz had a conversation with the defendant after the fact where the
> defendant came into the home. . . . And defendant told him, I did what I had to
> do. Ja disrespected me. He shouldn't have been going out with her. He shouldn't
> have been fooling around with Ella. It was the wrong thing to do, and I took care
> of it.

Id. at 28-29. David Ortiz did not testify at trial. The prosecutor also stated, "What I say is not

evidence. I want to be clear on this. This is kind of like a road map of what I expect the

evidence to show, or I hope the evidence will show." Id. at 32. He then added, "Some of [the]

witnesses have relationships to the defendant, strong relationships, and I do not expect all of

them to enter this courtroom." Id. Defense counsel made a very brief opening statement asking

the jury to pay attention and keep an open mind. Id. at 33-34.

　　　a.　　The People's Case

　　　The People first called Sandra Mason, mother of the victim, who testified that her son had

been killed. Id. at 35-36. The People then called Ella Peck. She testified about her relationship

with Prescott, their breakup, and her subsequent relationship with Mason. Id. at 40-46. She

testified that petitioner had accused her of "messing with" Mason a few days before Mason was

killed. Id. at 46-47. Two days before the crime, Prescott told Peck he wanted to talk to her about

their relationship, and she refused. Id. at 49. Prescott then came to her apartment at 3 A.M. and

told her on the phone, "Ja is in your house, Ja is in here. . . . I know he's in there." Id. at 50-51.

Prescott left after Peck called 911. Id. Two days later, on January 31, Mason told Peck that he

was going to meet Prescott at the Gowanus Houses because Prescott owed him some money. Id.

3

at 54-55. Peck testified she dropped him off there at 11:15 P.M. and then returned home. Id. at
58.

The prosecutor then asked Peck about conversations she had with Prescott between his
arrest on February 2, 2005, and the trial. Id. at 61. She testified about a phone conversation they
had some time after October 19, 2005, in which Prescott was asking about witnesses in the case.
Id. at 61-62. The prosecutor and Peck then had the following exchange:

> Q:    Did [the defendant] talk about his brother at all, Andre Prescott?
> A:    He made a comment to me again that he didn't do anything.
>        And I made a comment back to him, your brother made a statement. And
> he was, well, like he only made a statement because he was scared.
>        So I told him, if he was scared, why would he even say that you did it.
>        He's just basically, was trying to, I guess, get at the point that the brother
> made his testimony, whatever.
>                  MR. MEDOWS:        Objection. This is not the conversation.
>                  THE COURT:         Yes. Sustained.
> Q:    What I meant was, did he talk about his brother in relationship to testifying
>        at this trial?
> A:    Yes.
> Q:    What, if anything, did he say about that?
> A:    The only thing he said is that, like I say, he didn't do it.
>        And I said, well if you didn't, how did your brother make a statement.
> And he just made the comment, because my brother was scared.

Id. at 63-64.

The People next called several police officers who responded to the shooting, as well as
the medical examiner. Id. at 74-204. Of relevance, Police Officer Syed Shah testified that he
found Mason after he had been shot but was still alive. Id. at 78-79. He noticed that Mason had
a semiautomatic weapon in the left pocket of his jeans. Id. at 79, 87-88. He later discovered it
was a loaded 9-millimeter Smith and Wesson; however, there were no cartridges in the chamber.
Id. at 88-89. From Mason's coat pocket, Shah recovered thirty-one glassines of heroin and three

zip-loc bags of marijuana. Id. at 89. Detective Donald Faust testified that he established a crime

scene and did a canvass of potential witnesses. Id. at 109-10. Regarding his canvass, Det. Faust

testified,

> A:  We received some information, but no witnesses at that time.
> Q:  No eyewitnesses at that time?
> A:  Correct.
> Q:  Did you conduct interviews with any potential people during the course of
>      the next – we'll talk about just the next couple of days, February 1, 2005;
>      February 2, 2005?
> A:  Yes.
> Q:  Who were the individuals that you spoke to? Just the names. Don't go
>      into the substance of the conversation, please.
> A:  I interviewed Christine Alini.
> Q:  Who else?
> A:  Monica Ramsey and Dwayne Herbert.
> Q:  As a result of your conversations did you have a suspect in the case?
> A:  Yes.
> Q:  Who was the suspect in the case?
> A:  Ronald Prescott.

Id. at 110-11. Neither Shah nor Faust recovered any bullets or shell casings from the scene. Id.

at 81, 121. The medical examiner, Dr. Frede Frederic, testified that Mason had three bullet

wounds: one going through the left side of his chest, fracturing the left rib, traveling through the

heart and perforating the liver, id. at 168; the second entering the back, going through several

vital organs before resting in the muscle of the left side of the chest, id. at 170; and, finally, a

grazed wound on the side of the abdomen, id. Mason also had some abrasions on his knees and

on his right hand, around the knuckles. Id. at 171. Finally, Detective Bruno Valenti, who was

qualified as a ballistics expert, id. at 187, testified that if a 9-millimeter pistol were fired, shell

casings would be discharged from the weapon, whereas if a .38 caliber revolver were fired, shell

casings would not be discharged unless they were manually ejected. Id. at 193.

5

The People then called Dwayne Herbert. Id. at 210. Herbert testified that he had multiple felony and misdemeanor convictions for drug-related crimes, id. at 211-12, and at the time of the crime, he was taking heroin four or five times a day, id. at 236. On the day of the crime itself he took heroin in the morning and the afternoon, but the latest he took heroin that day was 4:30 or 5 P.M. Id. at 237. Herbert knew Prescott from the Gowanus Houses and had known him for approximately ten to twelve years before 2005. Id. at 216. He also knew Mason, as the two of them had grown up and attended school together. Id. at 217. On the night of the murder, Herbert left his girlfriend's apartment between 11:30 and 11:45 P.M. to go to the corner store. Id. He realized he had forgotten something and called up to his girlfriend's window, but testified she could not hear him because her air conditioner was on. Id. While he was calling up to her, Prescott came up behind him and stuck a .38 revolver in his back. Id. at 218. Prescott then made it clear he was joking and the two embraced. Id. When they embraced, Herbert smelled alcohol on Prescott's breath. Id. at 219.

Herbert then walked toward his grandmother's building and saw Prescott walk up a ramp toward where Mason was standing. Id. at 220. As Herbert was waiting for a friend to come out of the building, he heard two gunshots and ducked. Id. at 221. He then looked over and saw Prescott and Mason fighting. Id. at 221-22. He testified that he saw a weapon in Prescott's hand, "the same[ ].38 that he put in my back." Id. at 222. Herbert did not see anything in Mason's hands. Id. at 223. Mason then fled down the ramp, and Herbert heard Prescott say, "You reaching? You reaching?" Id. at 221, 223. Prescott then "emptied the rest of the remaining shells that he had in there in" Mason, shooting at him between four and six times. Id. at 223. Prescott then ran off. Id. at 224. Herbert testified that he interpreted Prescott's question, "you

reaching?" as referring to a weapon "because I guess Ja had something on him too." Id. But Herbert stated that Mason did not get a weapon out before he collapsed. Id.

The next day, police officers stopped Herbert and asked if he had seen anything. Id. at 225. He told them at first that he did not see anything, but finally spoke to detectives at the 76th Precinct when detectives told him they had several witnesses that put him at the scene of the crime. Id. at 225-26.

On cross-examination, defense counsel attacked Herbert's credibility on several grounds: He brought out that Herbert did not know the last name of a woman he claimed was his fiancée at the time of the crime. Id. at 230. He elicited further testimony about Herbert's criminal record and the fact that he was dealing and taking heroin in 2005. Id. at 232-35. Defense counsel also cross-examined Herbert's testimony that his girlfriend could not hear him call to her because her air conditioner was on, despite the fact that it was the middle of January and there was snow on the ground. Id. at 239-40. Defense counsel then asked about Herbert's contradictory statements to the police and asked if he finally gave a statement inculpating Prescott "because you were afraid that you were going to be charged with this crime." Id. at 243. Herbert denied that he made his statement for this reason. Id. at 243-44.

On re-direct, Herbert reiterated that he only heard the first two gunshots being fired, but when he turned around he saw Prescott with a gun, and saw Prescott shoot at Mason as Mason was fleeing down the ramp. Id. at 248-49. Following Herbert's testimony, the People rested. Id. at 249.

b.     Charge Conference

The trial court then held a charge conference in which defense counsel requested charges

on no adverse inference from the defendant not testifying, intoxication as negating intent, and a

lesser included offense of Manslaughter in the First Degree. Id. at 250-52.  The court granted

defense counsel's requested charges. Id. at 252.

c.     The Defense's Case

The defense called Linda Prescott, Ronald Prescott's aunt. Id. at 255.  She testified that

on January 31, 2005, her nephew Ronald came to her house at 9 A.M. and they spent the day

together. Id. at 257.  After dinner, Ronald went out with her son and they returned at 11:15 P.M.

Id. at 257-58.  Around midnight, Ronald came into Ms. Prescott's room and told her he heard

someone had been shot in his housing project. Id. at 258-59.  They then went to bed and Ronald

left the following morning around 8:30. Id. at 259.

On cross-examination, the prosecutor asked Ms. Prescott if she remembered being

interviewed by Detective Michael Habert on February 2, 2005. Id. at 262.  She replied that she

did not recall that conversation. Id.  The prosecutor asked, "[D]idn't you tell Detective Michael

Habert when you were asked if he was there on Monday night that you did not remember, he is a

grown man and he comes and goes all the time?" Id. at 263.  Ms. Prescott replied that she did

not. Id.  The prosecutor asked, "So you are saying this interview with Detective Habert never

happened?" Id. at 265.  Ms. Prescott replied, "No, no, never happened." Id.

Following Ms. Prescott's testimony, the defense rested. Id. at 273.

d.     The People's Rebuttal

8

The People then presented a rebuttal case, in which they called Detective Michael Habert.

Id. at 278. Det. Habert testified that on February 2, 2005, he went to Linda Prescott's apartment

to try to locate Ronald Prescott. Id. at 280. He testified:

> A:    . . . I asked her . . . had [he] been there on Monday night? And she related
>       she couldn't remember and that he's grown and he comes and goes all the
>       time.
> Q:    What was the night of the homicide to be clear?
> A:    That was Monday night, January 31st.

Id. at 281. On cross-examination, defense counsel asked Det. Habert if he recalled whether Ms.

Prescott had an oxygen bag; he replied, "Not that I remember." Id. at 282.

e.    Summations and Charge

Prior to summations, the trial court inquired as to whether Prescott had decided not to

testify. Id. at 284. He replied, "Yes." Id. The court then advised Prescott that "whether or not a

defendant testifies or does not is the decision with the advice of counsel of the defendant

himself." Id. Prescott stated that he understood. Id. The court then asked, "Do I correctly

understand that it was your decision with the advice of counsel not to testify in this case?"

Prescott replied, "Yes, your Honor." Id. After the jury was brought in, the court instructed them,

"[L]ike the opening statements, the summations of the attorneys will not constitute evidence.

The evidence as you've heard and are well aware now is the testimony given by the witnesses,

under oath, and the exhibits received incidental to that testimony." Id. at 285-86.

Defense counsel's summation focused on the fact that Mason was a drug dealer and asked

the jury, "Was he shot by a disgruntled client or was he shot by that man?" Id. at 290, 292. He

argued that Herbert was not a credible witness because his testimony was inconsistent, he was a

heroin addict and dealer, the forensic evidence did not support his account, and that Herbert's

9

initial statement to the police that he had not seen anything displayed consciousness of his own guilt for the killing. Id. at 292-98. With regard to Linda Prescott's testimony, defense counsel argued Ms. Prescott was a credible, "solid middle class citizen . . . who says he was with her and she remembers because he got a call on his cell phone saying someone was dead." Id. at 300. He pointed out that Ms. Prescott had an oxygen bag and questioned the reliability of Det. Habert's testimony since he did not remember the bag. Id. Defense counsel did not argue that Prescott's intoxication negated intent, or that he intended only to cause serious physical injury, and not to kill, as would support a conviction for the lesser included offense of Manslaughter in the First Degree.

The People's summation began with an attack on the credibility of Linda Prescott. Id. at 303. Defense counsel objected and an off-the-record discussion was held at the bench, after which defense counsel withdrew his objection. Id. The prosecutor then further questioned the credibility of Ms. Prescott based on her not coming forward as a witness earlier and Det. Habert's impeaching testimony. Id. at 304-05. He urged the jury to disregard Ms. Prescott's testimony because she had lied. Id. at 306.

The prosecutor went on to argue that Herbert's eye-witness testimony and the testimony of Ella Peck were credible. Id. 307-24. In response to defense counsel's argument that Herbert had spoken to the police only because he was afraid that other witnesses had accused him of being the shooter, the prosecutor read Det. Faust's testimony about canvassing the area. Id. at 309-10. This included repeating the testimony that detectives had interviewed several witnesses (including Herbert) and that based on those conversations, they developed Prescott as the suspect in the case. Id. at 310. He emphasized, speaking in the voice of the officers talking to Herbert, it

10

was "[n]ot that people were saying that you were the shooter, you were out there, tell us what happened. Tell us what you know. Prescott did it, that's how it flowed." Id. at 311. The prosecutor also recalled the conversations that Prescott had with Peck about witnesses in the case, saying, "[T]he defendant was asking about the details of the case to her. What do they got? They have witnesses? That I submit to you is consciousness of guilt." Id. at 319.

Following summations, the trial court charged the jury. Id. at 325. With regard to the reasonable doubt standard, after repeatedly stating that the burden was on the People to prove each element of the crime charged beyond a reasonable doubt, id. at 333-36, the court charged:

> Once more, if after evaluating all of the credible evidence received both on cross examination as well as direct-examination . . . and each exhibit you should find that the evidence is evenly balanced, or if you should find that it is as consistent with innocence as with guilt, defendant must be acquitted as to any such charge or charges. The standard, once more, is proof beyond a reasonable doubt which brings us to reasonable doubt and the meaning of that term.
> A reasonable doubt is an actual doubt that a jury is conscious of having after reviewing all of the evidence in the case . . . . If having reviewed the evidence you feel uncertain and not fully convinced by such evidence or lack of evidence that defendant is guilty of a crime charged, and if you believe that you're acting in a reasonable manner and that a reasonable person in any manner of like importance would hesitate to act because of such a doubt as you're conscious of having, then a reasonable doubt exists.

Id. at 336-37. The court went on to explain that a reasonable doubt was not the same as any doubt, but was rather "a doubt reasonable people may entertain after a careful review of all the evidence in the case." Id. at 337.

After deliberation, the jury convicted Prescott of Murder in the Second Degree and Criminal Possession of a Weapon in the Second Degree. Id. at 370. The trial court subsequently sentenced him to twenty-five years to life on the murder count and a definite term of fifteen years on the criminal possession count, to run concurrently. Sentencing Hr'g Tr. 7-8.

11

II.    *Post-Trial Proceedings*

    a.    First § 440.10 motion

Represented by new appellate counsel, petitioner filed a motion to vacate the judgment

pursuant to N.Y. Crim. Proc. L. § 440.10. Dkt. #12, Ex. D. The motion argued that petitioner

was denied the effective assistance of counsel "by his trial attorney's presentation of a materially

impeachable alibi witness, and failure to challenge the admissibility of hearsay evidence

implicating the defendant as the shooter, while counsel ignored a viable alternate defense for

which he had successfully sought jury instructions but did not argue on summation." Id., Mem.

of Law 1. Appellate counsel attached an affirmation to the motion, in which he described the

trial evidence and trial counsel's purported failures. Id., Affirmation of Appellate Counsel.

Notably, appellate counsel added to the record an account of a telephone call he had with trial

counsel on October 8, 2007. Id. at 12-14. In that conversation, trial counsel said,

> he believed it was the "defendant's call," not the attorney's, as to whether an alibi
> witness should be called. He said that he did not make an "independent decision"
> as to the benefits or risks of calling Ms. Prescott, but he did not claim that
> defendant had insisted that his aunt take the stand. Counsel believed it would
> constitute ineffective assistance of counsel if he did not call an alibi witness his
> client wanted to testify.

Id. at 13. Appellate counsel also asked trial counsel why he did not seek a charge of

Manslaughter in the Second Degree, which requires proof of a mental state of recklessness. Id.

Trial counsel "replied that he did not think that second-degree manslaughter was a lesser

included offense of second-degree murder as a matter of law." Id. Appellate counsel also

attached a copy of Det. Habert's police report filed after he spoke with Linda Prescott in which

she related that she did not remember whether petitioner was at her apartment the night of the

murder. Id., Mem. of Law, Ex. B. Appellate counsel asserted that this report was furnished to trial counsel as Rosario material, "but there is no evidence he was aware of it." Id., Mem. of Law 4.

Justice James P. Sullivan of the New York Supreme Court denied petitioner's § 440.10 motion on July 18, 2008. Dkt. #12, Ex. F. He ruled that all of the claims, except for the presentation of the alibi defense, were fully reviewable on the record and were therefore procedurally barred. With respect to the alibi issue, Justice Sullivan ruled, "Although the People may have discredited the alibi testimony, this did not 'seriously compromise' the defendant's right to a fair trial as the sole witness to the shooting knew the defendant very well and identification was not in issue." Id. at 5. Petitioner appealed this decision to the Appellate Division, which denied leave to appeal. Dkt. #1, at 6.

      b.     Direct Appeal

Petitioner also appealed his conviction to the Appellate Division in a brief dated "November 2008." Dkt. #12, Ex. B, at 39. The direct appeal raised the same issues as petitioner's first § 440.10 motion. The Appellate Division affirmed the judgment and denied all the issues on the merits. People v. Prescott, 880 N.Y.S.2d 567, 567 (App. Div. 2009). Petitioner sought leave to appeal this decision to the New York Court of Appeals, which denied leave to appeal. Dkt. #1, at 2.

      c.     Second § 440.10 motion and federal habeas petition

13

Petitioner filed a second, pro se motion to vacate dated October 7, 2009. See Dkt. #14.[1]
He asserted a new ground for his ineffective assistance of counsel claim; namely, that he was
denied the "right to assert a justification defense on his own behalf." Dkt. #12, Ex. H, at 2.
Justice Raymond Guzman of the New York Supreme Court denied the motion on March 30,
2010. Id. at 4. Justice Guzman stated that "defendant makes clear that he insisted his attorney
allow the alibi witness to testify at trial. Now, defendant argues that the shooting was justified,
and he should have been advised of the possibility of raising that defense." Id. at 3. He held that
trial counsel could not be faulted for failing to advise petitioner about the justification defense
when petitioner "himself led his attorney to believe he was not present." Id. Justice Guzman
stated that he gave "no credit to defendant's new arguments" and there was "no reasonable
possibility that these new allegations, essential to the motion, are true." Id. at 4. He therefore
denied the motion without a hearing. Id.

Petitioner sought leave to appeal the denial of his motion. Dkt. #1, at 4. While the leave
application was pending, petitioner filed a federal habeas petition, docketed under No. 10-CV-
2990. Although respondent failed to raise exhaustion in its response, see 10-CV-2990, Dkt. #3,
at 13-14, petitioner timely informed the court that the justification issue was unexhausted and
sought to have his petition dismissed without prejudice or stayed, id., Dkt. #4. This court
accordingly dismissed the petition without prejudice, id., Dkt. #7, and the Appellate Division
denied leave to appeal on January 12, 2011, id., Dkt. #10; 11-CV-482, Dkt. #3. Petitioner
thereafter filed the instant petition on January 26, 2011. 11-CV-482, Dkt. #1, at 11.

---

[1]The second § 440.10 motion was not included in the state court record filed by
respondent. In response to a request from the court, Dkt. #13, petitioner provided a copy.

14

**DISCUSSION**

I.   *Standard of Review*

The Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA") established a

deferential standard that federal habeas courts must apply when reviewing state court

convictions.  28 U.S.C. § 2254(d).  The statute provides, in pertinent part:

> (d) An application for a writ of habeas corpus on behalf of a person in custody
> pursuant to the judgment of a State court shall not be granted with respect to any
> claim that was adjudicated on the merits in State court proceedings unless the
> adjudication of the claim–
>
>> (1) resulted in a decision that was contrary to, or involved an
>> unreasonable application of, clearly established Federal law, as
>> determined by the Supreme Court of the United States . . . .
>>
>> (2) resulted in a decision that was based on an unreasonable
>> determination of the facts in light of the evidence presented in the
>> State court proceeding.

Id.

The phrase "clearly established Federal law, as determined by the Supreme Court of the

United States" refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's

decisions as of the time of the relevant state-court decision."  Williams v. Taylor, 529 U.S. 362,

412 (2000).  A state court decision is "contrary to" clearly established Supreme Court precedent

if "the state court applies a rule that contradicts" Supreme Court precedent or if "the state court

confronts a set of facts that are materially indistinguishable from a decision of [the Supreme]

Court and nevertheless arrives at a result different from [that] precedent."  Id. at 405-06.  With

respect to the "unreasonable application" clause, "a federal habeas court . . . should ask whether

the state court's application of clearly established federal law was objectively unreasonable."  Id.

15

at 409. "Where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief." Harrington v. Richter, --- U.S. ---, 131 S. Ct. 770, 784 (2011).

II.    *Ineffective Assistance of Counsel*

Petitioner argues that his counsel was ineffective for (1) presenting the impeached alibi defense; (2) failing to object to hearsay evidence and a related portion of the prosecutor's opening statement; (3) excluding the viable defenses of intoxication and first-degree manslaughter from his summation; (4) failing to object to the court's reasonable doubt instruction; (5) not seeking an instruction on Manslaughter in the Second Degree; and (6) failing to advise petitioner on his right to testify and on the defense of justification.

a.    Legal standard

A petitioner seeking a writ of habeas corpus on ineffective assistance of counsel grounds faces a heavy burden in establishing entitlement to relief. Strickland v. Washington, 466 U.S. 668 (1984), established the two-prong test by which ineffective assistance of counsel claims are adjudicated. Under Strickland, a petitioner must demonstrate, first, that counsel's performance fell below "an objective standard of reasonableness" under "prevailing professional norms," id. at 688, and second, that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. A court need not decide both prongs of the Strickland test if the showing on one is insufficient. See id. at 697.

In analyzing a claim that counsel's performance fell short of constitutional standards, the court must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance . . . [and] might be considered sound trial strategy." Id. at 689

(internal quotation marks omitted). In so doing, it must "affirmatively entertain the range of possible reasons [petitioner]'s counsel may have had for proceeding as they did." Cullen v. Pinholster, --- U.S. ---, 131 S. Ct. 1388, 1407 (2011) (citation and internal quotation marks omitted). Strickland "calls for an inquiry into the objective reasonableness of counsel's performance, not counsel's subjective state of mind." Richter, 131 S. Ct. at 790; accord Pinholster, 131 S. Ct. at 1407.

Moreover, when ineffective assistance of counsel claims are presented on collateral habeas review, the court assesses them subject to the strictures of AEDPA and must be "doubly deferential" in reviewing the state court's determination that counsel acted effectively. Knowles v. Mirzayance, 556 U.S. 111, 123 (2009) (citing Yarborough v. Gentry, 540 U.S. 1, 5-6 (2003) (per curiam)); see 28 U.S.C. § 2254(d). To prevail on an ineffective assistance of counsel claim on habeas review, a petitioner must show not only that counsel's performance fell below the Strickland standard but also that the state court's adjudication of the Strickland standard was itself unreasonable. See Richter, 131 S. Ct. at 785. Stated differently, the court may afford habeas relief only upon a finding that the state court was unreasonable—and not merely incorrect—in concluding that counsel's performance did not fall below an objective standard of reasonableness or that petitioner was not prejudiced. See id.

     b.     Petitioner's Claims

     1.     Presentation of Alibi Witness and Exclusion of Other Defenses

Trial counsel in this case presented an alibi defense through a witness that was subsequently impeached. Many of counsel's tactical decisions – and thus many of petitioner's ineffective assistance claims – flow from this initial choice to present an alibi. For example,

17

although counsel obtained charges on intoxication and the lesser included offense of first-degree

manslaughter, his summation focused exclusively on the argument that petitioner was not present

at all, and that the eyewitness who identified him as the shooter was lying. The court must

therefore assess whether counsel's choice to present the alibi defense amounted to ineffective

assistance in order to determine whether he was ineffective for failing to present other defenses.

Following the two prongs of Strickland, this inquiry will proceed in two parts: First, whether

counsel's decision was the result of "reasonable professional judgment." Strickland, 466 U.S. at

690. Second, if counsel's decision was unreasonable, did the choice prejudice petitioner given

the available alternative defenses?

Notably, in this case, we have some evidence about counsel's reason for electing the alibi

defense: We know from his conversation with appellate counsel that trial counsel presented the

alibi because he believed it was the "defendant's call," not the attorney's. This rationale displays

a misunderstanding of the allocation of responsibility between the attorney and client, where an

attorney has a duty to consult with her client on "questions of overarching defense strategy" but

"has authority to manage most aspects of the defense," such as tactical decisions. Florida v.

Nixon, 543 U.S. 175, 187 (2004) (citing Taylor v. Illinois, 484 U.S. 400, 417-18 (1988); see

Model Rules of Prof'l Conduct R. 1.2(a). Therefore, counsel's subjective choice of the alibi

defense was not a "strategic choice[] made after thorough investigation of law," Strickland, 466

U.S. at 690 (emphasis added), because trial counsel was ignorant of the law.

Nevertheless, the Supreme Court's recent cases make clear that the ineffectiveness

inquiry must focus on the objective reasonableness of counsel's choice, not counsel's subjective

reasons. Richter, 131 S. Ct. at 790; Pinholster, 131 S. Ct. at 1407. Here, although counsel was

18

ignorant of the law, the court cannot say that his choice of the alibi defense was objectively unreasonable. This is because a reasonably competent attorney, knowing that the choice of whether to present an alibi defense was hers, not the defendant's, still likely would have opted for this defense rather than the alternatives. There was substantial evidence in this case that Prescott intentionally killed Mason. Peck's testimony provided a motive for the killing. Herbert saw Prescott point his .38-caliber revolver at Mason and fire as Mason was fleeing. Prescott shot Mason multiple times. Three bullets hit Mason, including one that entered at the front of his chest and traveled through the heart. A defense that placed Prescott away from the Gowanus Houses on the night of the murder thus would have been attractive to any reasonable attorney.

This was especially true in light of the weakness of the other defenses. The evidence of intoxication was slight: Herbert testified only that he smelled alcohol on Prescott's breath. Petitioner's subsequent activity, including sticking a gun in Herbert's back as a joke, talking to Mason, then fighting with, and ultimately shooting him, though violent, "simply d[id] not evince incapacitating intoxication." Garfield v. Poole, 421 F. Supp. 2d 608, 613 (W.D.N.Y. 2006) (alteration in original) (quoting People v. Monroe, 716 N.Y.S.2d 114, 116 (App. Div. 2000)). Therefore, there was little evidentiary basis to support a finding of intoxication to negate intent. Similarly, a charge of second-degree or "reckless" manslaughter premised on intoxication was unlikely to prevail. See N.Y. Penal Law § 15.05(3) (noting intoxication can be a basis for a reckless state of mind). The evidence also did not support a conviction of Manslaughter in the First Degree, which requires intent to cause serious physical injury, but not death, see N.Y. Penal L § 125.20(1), since, again, Prescott shot Mason multiple times, including once through the heart.

19

A justification defense was even less savory than these unpromising options. New York

Penal Law provides in relevant part:

> A person may . . . use physical force upon another person when and to the extent
> he or she reasonably believes such to be necessary to defend himself, herself or a
> third person from what he or she reasonably believes to be the use or imminent
> use of unlawful physical force by such other person, unless . . . .
> The actor was the initial aggressor . . . .

N.Y. Penal L. § 35.15(1)(b) (emphasis added). Here, there was extensive evidence that Prescott

was the initial aggressor. Although Herbert did not see who fired the first two shots, he

witnessed Prescott holding a gun immediately after the shots were fired. He never saw Mason

holding a gun. Further, the ballistics expert testified that any shots fired from a 9-millimeter

pistol (Mason's weapon) would have left shell casings on the ground, whereas a .38 caliber

revolver (Prescott's weapon) would not discharge shell casings unless manually ejected. No

shell casings were found. Finally, Mason's gun was found in his pocket with no cartridge in the

chamber, indicating he never drew it. Thus, the evidence clearly indicated that Prescott fired the

first two shots, Mason then ran down the ramp, after which Prescott said, "you reaching?" and

killed Mason. Since the evidence demonstrated that Prescott was the initial aggressor, there was

no basis for a justification charge, let alone an argument by counsel. See, e.g., People v.

Pequero, 877 N.Y.S.2d 230, 231 (App. Div. 2009) (defendant not entitled to justification charge,

though victim was armed, where defendant was initial aggressor).

Competent counsel, surveying the options available, could reasonably have pursued the

alibi defense, even knowing that the People would attempt to impeach it. Counsel could have

pursued a strategy of arguing (as counsel did here) that the jury should credit Linda Prescott,

20

rather than Herbert and Det. Habert. That strategy may not have been winning, but it was not unreasonable.

Accordingly, even though counsel opted for the alibi based on a misunderstanding of law, the choice to advance that theory in summation to the exclusion of arguments on intoxication and first-degree manslaughter was not objectively unreasonable. See Aparicio v. Artuz, 269 F.3d 78, 95 (2d. Cir. 2001) ("Counsel is not obligated to advance every nonfrivolous argument that could be made."); Gibbs v. Donnelly, 673 F. Supp. 2d 121, 143 (W.D.N.Y. 2009) ("The strategy of pursuing a completely exculpatory defense instead of a partially exculpatory defense is one of the many decisions made by trial counsel which are entitled to substantial deference."). The same holds true for counsel's failure to request a lesser included offense charge for second-degree manslaughter. See, e.g., Ramdeo v. Phillips, No. 04-CV-1157 (SLT)(RLM), 2007 WL 1989469, at *34 (E.D.N.Y. July 9, 2007) (counsel's decision not to request lesser included offense not unreasonable where "counsel's strategy . . . denied guilt altogether"); Yu v. United States, No. 97 Civ. 2736(MBM), 1997 WL 423070, at *3 (S.D.N.Y. June 29, 1997) (same). Finally, since no charge on justification was warranted, counsel cannot be held ineffective for failing to present that defense. See, e.g., Rivera v. Ercole, No. 07 Civ. 3577(RMB)(AJP), 2007 WL 2706274, at *23-26 (S.D.N.Y. Sept. 18, 2007) (counsel not ineffective for failure to advance justification defense where facts would not warrant justification defense under New York law); see also Desmarat v. Artus, 09-CV-231 (JG), 2009 WL 2867900, at *13 (E.D.N.Y. Sept. 3, 2009) (holding counsel not unreasonable for pursuing misidentification defense to the exclusion of justification defense).

21

Moreover, even assuming _arguendo_ that counsel's performance was deficient, petitioner cannot establish prejudice because none of the alternative defenses were likely to succeed. _See_ _Hill v. Lockhart_, 474 U.S. 52, 59 (1985) ("[T]he resolution of the 'prejudice' inquiry will depend largely on whether the affirmative defense [not presented] likely would have succeeded at trial."). Petitioner insists he was prejudiced by counsel's presentation of the alibi defense, relying heavily (in his first § 440.10 motion and direct appeal brief) on _Henry v. Poole_, 409 F.3d 48 (2d Cir. 2005). In that case, the Second Circuit analyzed a case in which a "false alibi" was presented to the jury through the defendant's girlfriend. The girlfriend testified that the defendant had been with her on a certain day, but that day was not the day of the murder. _Id._ at 53-54. The alibi was therefore no alibi at all, and instead bolstered the State's weak case by evincing consciousness of guilt. _Id._ at 65-66. On that basis, the Second Circuit held Henry's trial attorney was ineffective. But the prejudice in _Henry_ was much more substantial than here.

First, in _Henry_, the so-called alibi evidence was actually _consistent_ with defendant's guilt, whereas here, the alibi was merely impeached by the testimony of Det. Habert. Second, _Henry_ was a case where misidentification was likely: the identifying witness did not know the defendant prior to the crime, had observed him for only ten minutes during the robbery, and had given a description of his assailant that did not match the defendant. _Id._ at 66. Here, as Justice Sullivan correctly noted in his decision on the first § 440.10 motion, identification was not really in issue: Herbert knew Prescott for many years, and there was no real question that he had mistakenly identified him.

Further, defense counsel did raise numerous reasons for the jury to discount Herbert's testimony: the testimony contained inconsistencies, Herbert took drugs the day of the shooting,

22

and Herbert supposedly had a motive to kill Mason himself. But the jury was perfectly justified in rejecting these arguments based on the evidence adduced at trial. First, the prosecutor did not hide the fact that Herbert had a criminal history and was involved in the drug trade, but his testimony was not incredible on that basis alone. Second, the inconsistencies in his testimony were related to tangential issues and his testimony regarding the murder itself was consistent. Finally, the notion that Herbert had a motive to kill Mason since the former was a heroin addict and the latter was a dealer was specious at best, especially given that Mason was found with his product <u>on</u> him, suggesting that whoever killed him did not do it to steal heroin. Moreover, the People presented unrebutted testimony that Prescott had a motive to kill Mason: namely, his jealousy over Peck leaving him and taking up with Mason. Thus, although <u>Henry</u> provides helpful admonition to counsel who, as here, embarks on an alibi defense that has great potential to backfire, on the issue of prejudice, <u>Henry</u> is easily distinguishable.

For these reasons, the state courts were not unreasonable in rejecting petitioner's claims that counsel was ineffective for (1) presenting the alibi defense, (2) failing to argue intoxication and first-degree manslaughter in summation, (3) failing to request a charge on the lesser included offense of second-degree manslaughter, and (4) failing to present a justification defense.

2.      Hearsay Evidence/Prosecutor's Opening

Petitioner argues counsel should have objected to hearsay testimony that (1) he confessed to his cousin, David Ortiz; (2) his brother made a statement implicating petitioner; and (3) other people Det. Faust interviewed implicated defendant. This claim is without merit.

First, with respect to the prosecutor's opening statement, the prosecutor stated, "What I say is not evidence. I want to be clear on this. This is kind of like a road map of what I expect

23

the evidence to show, or I hope the evidence will show." Tr. 32. The prosecutor may have thought at that time that David Ortiz would testify and was merely previewing what he believed the testimony would be. Further, the court instructed the jury prior to summations, "[L]ike the opening statements, the summations of the attorneys will not constitute evidence" Id. at 285. Juries are presumed to follow the court's instructions. United States v. Becker, 502 F.3d 122, 130 (2d Cir. 2007). Petitioner has failed to show that the prosecutor's statement was so damaging (or was even intended to be so) as to overcome this presumption. Cf. id. at 130-31.

Second, petitioner's argument with respect to Peck's testimony about Andre Prescott's statement fails because the statements at issue were not offered to prove the truth of the matter asserted. The testimony was plainly part of an effort by the prosecutor to show that petitioner was asking Peck about the witnesses against him. The passing reference to the content of his brother's statement was not elicited to prove the truth of its contents.[2] The prosecutor said as much in his summation, arguing, "[T]he defendant was asking about the details of the case to her. . . . That I submit to you is consciousness of guilt." Id. at 319. The reference to Andre Prescott's statement was not hearsay.

Finally, Det. Faust's testimony that he spoke to several witnesses in his canvass of the crime scene and developed Prescott as a suspect was ambiguous at best. It did not necessarily imply that all these witnesses implicated Prescott. Det. Faust stated he talked to two witnesses, followed by Herbert. The People's whole case rested on the narrative that Herbert had been the sole eyewitness to the crime and he inculpated Prescott. Therefore, a likely implication of Det.

---

[2]The court also sustained an objection by defense counsel just after Peck relayed the contents of Andre Prescott's statement, but it is not clear from the record to what, precisely, counsel was objecting. See Tr. 63.

Faust's testimony was that he talked to several people, before finally talking to Herbert, and <u>then</u> developed Prescott as a suspect. The prosecutor repeated this testimony in his summation to suggest that the other witnesses had indicated Herbert was present, but not the shooter himself, saying, "Not that people were saying that you [Herbert] were the shooter, you were out there, tell us what happened. Tell us what you know. Prescott did it, that's how it flowed." <u>Id.</u> at 311. The People, thus, were not seeking to imply that the other witnesses implicated Prescott, nor that the jury should take these out-of-court statements for their truth. Rather, the narrative explained how the investigation led to Herbert, who then told them (and repeated in his in-court testimony), "Prescott did it." These statements also were not hearsay.

Petitioner's claim of ineffective assistance of counsel based on these supposed hearsay statements is accordingly without merit.

### 3.   Reasonable Doubt Instruction

Prescott next argues that his counsel was ineffective for failing to object to the trial court's instruction, "if . . . you should find that the evidence is evenly balanced, or if you should find that it is as consistent with innocence as with guilt, defendant must be acquitted." Tr. 336. Although the New York courts have held that such "evenly balanced" language is "strongly disapproved" because it can lead the jury to believe that a standard less than beyond a reasonable doubt is sufficient for conviction, <u>see, e.g.</u>, <u>People v. Jackson</u>, 509 N.Y.S.2d 230, 232 (App. Div. 1986), errors in jury instructions must be examined in light of the charge as a whole. <u>See</u> <u>Cupp v. Naughten</u>, 414 U.S. 141, 146-47 (1973). Here, the "evenly balanced" reference "was isolated and was followed by a complete instruction on reasonable doubt." <u>People v. Weatherspoon</u>, 547 N.Y.S.2d 721, 722 (App. Div. 1989). "The charge, when read as a whole, conveyed the correct

25

rule of law." Id. Consequently, even if counsel was deficient for failing to object, this error produced no prejudice.

        4.    Right to Testify

Finally, Prescott argues counsel failed to inform him of his right to testify. This claim is belied by the record. The court advised Prescott that "whether or not a defendant testifies or does not is the decision with the advice of counsel of the defendant himself." Tr. 284. Prescott stated that he understood. The court then asked, "Do I correctly understand that it was your decision with the advice of counsel not to testify in this case?" Prescott replied, "Yes, your Honor." Id. In his second § 440.10 motion, Prescott faults counsel not for failing to advise him of his right to testify, but for failing to advise him to testify that the murder was justified. Dkt. #14, at 2. But, as discussed above, a justification defense would have failed because Prescott was the initial aggressor. Therefore, counsel's advice that Prescott should not testify and instead "stick to the alibi defense," id., was reasonable advice that any competent counsel would have given. Prescott's claim of ineffective assistance of counsel on this ground is therefore without merit.[3]

## CONCLUSION

For the foregoing reasons, the petition is denied. As petitioner has failed to make a substantial showing of the denial of a constitutional right, a certificate of appealability is denied.

---

    [3]The court notes that the basis for Justice Guzman's decision – that petitioner "insisted his attorney allow the alibi witness to testify at trial," Dkt. #12, Ex H, at 3 (emphasis added) – was contrary to the record. See Dkt. #12, Ex. D, Affirmation of Appellate Counsel 13. Nevertheless, even under a de novo standard of review, this court cannot find counsel ineffective based on the record of the trial and the facts adduced in the second § 440.10 motion for the reasons discussed above.

28 U.S.C. § 2253(c)(2).  The Clerk of the Court is directed to enter judgment accordingly and

close the case.

SO ORDERED.

Allyne R. Ross.
United States District Judge

Dated: March 21, 2013
    Brooklyn, New York

27

**Service List:**

Ronald Prescott
#06-A-3065
Green Haven Correctional Facility
594 Rt. 216
P.O. Box 4000
Stormville, NY 12582